JUDGE CASTEL

Paul M. Fakler (PF-0249)
Ross Charap (RC-2584)
Julie Stark (JS-8925)
Amanda J. Schaffer (AS-2004)
MOSES & SINGER LLP
405 Lexington Avenue
New York, New York 10174-1299
Tel.: 212-554-7800
Fax: 212-554-7700
pfakler@mosessinger.com
*Attorneys for Plaintiffs*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

GREGORY LENOIR ALLMAN, JAIMOE F/K/A
JOHNNY LEE JOHNSON, CLAUDE HUDSON
TRUCKS P/K/A BUTCH TRUCKS and FORREST
RICHARD BETTS P/K/A DICKEY BETTS,

     Plaintiffs,

 - against -

UMG RECORDINGS, INC., a Delaware
corporation,

     Defendant.
------------------------------------------------------------ X

08 Civ.
 ECF Case

**COMPLAINT AND
JURY DEMAND**

  Plaintiffs, Gregory Lenoir Allman ("Allman"), Jaimoe f/k/a Johnny Lee Johnson ("Jaimoe"), Claude Hudson Trucks p/k/a Butch Trucks ("Trucks") and Forrest Richard Betts p/k/a Dickey Betts ("Betts"), for their Complaint against Defendant UMG Recordings, Inc. ("UMG") by their counsel Moses & Singer LLP, allege upon information and belief as to facts concerning others and upon personal knowledge as to facts concerning Plaintiffs, as follows:

## **NATURE OF THE ACTION**

1. This action arises from UMG's willful breach of its recording agreement with Plaintiffs by (1) paying them only a small fraction of the royalties due for digital downloads and other digital exploitation of Plaintiffs' classic musical recordings; (2) refusing to negotiate royalty rates for newly released configurations of those recordings; and (3) continuing to sell such newly configured recordings after failing to renegotiate.

2. Plaintiffs are or have been members of one of the most famous and influential American rock and roll bands of all time: the Allman Brothers Band. UMG is the successor in interest to an agreement entered into between Plaintiffs and Polygram Records, Inc. ("PRI") in 1985 (the "1985 PRI Agreement"), pursuant to which Plaintiffs granted PRI the right to exploit certain master recordings (the "Capricorn Masters") created by the Allman Brothers Band during the period of 1969 through 1980 for its first record label, Capricorn Records, Inc. ("Capricorn").

3. As described in more detail below, the 1985 PRI Agreement expressly provides that when UMG, *inter alia*, licenses the Capricorn Masters for the sale of records by third parties, licenses the Capricorn Masters on a flat-fee basis, or makes any commercial usage of the Masters that is not specifically provided for in the 1985 PRI Agreement, UMG must pay Plaintiffs and the other members of the Allman Brothers Band fifty percent (50%) of UMG's net receipts from such exploitation. Although it licenses the Capricorn Masters to various third parties, such as Apple, Inc. for its iTunes music service, on a flat per-copy fee basis for those third parties' creation and distribution of digital downloads and other digital products, UMG ignores the plain language of this provision and refuses to pay Plaintiffs at the correct royalty rate for its digital exploitation

of the Capricorn Masters. Instead, UMG treats these licensed distributions as sales through "Normal Retail Channels," a defined term that only applied to the sale of physical LP records and tapes through normal record stores at the time of the agreement. That defined term expressly excludes new configurations such as digital downloads.

4. The 1985 PRI Agreement also requires that, three years after the release of each new compact disc configuration or other new configuration, UMG must renegotiate in good faith the royalties to be paid for such new configurations, in recognition of the facts that (among other things) the risks and rewards associated with the sale of new configurations often change over time. Again, UMG has ignored its obligation under the Agreement and has refused to enter into good faith negotiations with Plaintiffs with respect to various newly configured compact discs (including releases of prior compact discs with added material or under new catalogue numbers) as well as digital downloads and UMG's other digital exploitation of the Capricorn Masters such as ringtones. In further violation of the 1985 PRI Agreement, UMG has continued to distribute these new configurations even after refusing to renegotiate terms.

5. UMG's wanton disregard for its obligations under the 1985 PRI Agreement is inexcusable. Records derived from the Capricorn Masters have sold many millions of copies since 1969. Those recordings paid for themselves many times over, even before PRI acquired them. UMG incurs practically no expenses or risks in connection with the Masters, particularly with respect to licensing other companies such as Apple to create and distribute digital downloads through those companies' on-line services, yet UMG reaps millions of dollars every year from such exploitation. In this context, UMG's theft of Plaintiffs' royalties and failure to live up to its contractual

obligations is all the more outrageous. Plaintiffs seek monetary relief in compensation for UMG's failure to pay royalties for digital exploitation at the correct rate. In the alternative, Plaintiffs seek injunctive relief, requiring UMG to stop its unlawful exploitation of digital downloads and other new configurations in the absence of newly-agreed royalty terms as required by the 1985 PRI Agreement, and disgorgement of UMG's profits from its unlawful exploitation of new configurations more than three years after the initial release of each such compact disc or digital configuration.

## JURISDICTION AND VENUE

6.  Plaintiffs bring this breach of contract action pursuant to the laws of the State of New York.

7.  This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

8.  This Court has personal jurisdiction over the Defendant because UMG is a foreign corporation registered to do business within the State of New York and is doing business in New York and in this District. The terms of the 1985 PRI Agreement also provide this Court with personal jurisdiction.

9.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a) and (c) because UMG resides in this District and a substantial part of the events giving rise to this action took place in this District. The terms of the 1985 PRI Agreement also provide this Court with proper venue.

## PARTIES

10. Plaintiff Allman is a resident of the State of Georgia, and has been a member of the Allman Brothers Band since 1969.

11. Plaintiff Jaimoe is a resident of the State of Connecticut, and has been a member of the Allman Brothers Band since 1969.

12. Plaintiff Trucks is a resident of the State of Florida, and has been a member of the Allman Brothers Band since 1969.

13. Plaintiff Betts is a resident of the State of Florida, and was a member of the Allman Brothers Band from 1969 through 2000.

14. Defendant UMG is a Delaware corporation with executive offices at 1755 Broadway, New York, New York 10019.

## BACKGROUND

### The Allman Brothers Band

15. The Allman Brothers Band was formed in Georgia in 1969 by Allman, his brother Howard Duane Allman (now deceased), Trucks, Jaimoe, Betts and Raymond Berry Oakley III (now deceased). In the almost forty years since that time, the Allman Brothers Band has been one of the most successful rock and roll groups in history, selling over 50 million records worldwide. The Band forged a new genre of "Southern rock," expanding the existing contours of blues-based rock music to include diverse influences such as jazz, Western swing and bluegrass. The Band's place in music history was formally recognized in 1995, when the Allman Brothers Band was inducted into the Rock and Roll Hall of Fame. Even after four decades, the Band remains an active and vital force, touring nationally and averaging over 60 live concerts every year.

16. The Allman Brothers Band signed their first recording contract with Capricorn in 1969, and recorded several ground-breaking record albums for Capricorn. Capricorn was owned by Phil Walden, who also acted as the Band's manager and music publisher. Notwithstanding the Band's substantial record sales, Capricorn encountered financial difficulties and filed for bankruptcy protection in 1979. As part of the bankruptcy proceeding, PRI acquired the Capricorn Masters.

17. In order to perfect its ability to exploit the Capricorn Masters, PRI negotiated and entered into the 1985 PRI Agreement with the members of the Allman Brothers Band, including Plaintiffs.

18. PRI was subsequently acquired by Universal Music Group, and UMG eventually became the successor in interest to PRI with respect to the Capricorn Masters and the 1985 PRI Agreement.

### Terms of the 1985 PRI Agreement

19. The 1985 PRI Agreement superseded any earlier agreements between the Allman Brothers Band and Capricorn or PRI with respect to the Capricorn Masters.

20. The 1985 PRI Agreement requires UMG to pay Plaintiffs at various royalty rates, depending upon the manner of UMG's exploitation of the Capricorn Masters. The first three royalty provisions, paragraphs 3.01 – 3.03, provide rates of varying percentages of Net Sales (as defined) by UMG for distribution through Normal Retail Channels (as defined) in various regions throughout the world. Paragraph 7.14 of the Agreement defines Normal Retail Channels as '[n]ormal retail distribution channels excluding sales of Records described in paragraphs 3.04., 3.05., 3.06., 3.07. and 3.08. herein." At the time the 1985 Agreement was executed, these provisions only applied to

PRI's sale of physical copies of vinyl records and tapes through normal music retailers. Indeed, the 1985 PRI Agreement expressly excludes from the definition of Normal Retail Channels any sales described in paragraph 3.04, which covers all sales "in the form of compact discs or other new Record configurations."

21. Royalty rates for other types of physical sales by UMG or its affiliates, through certain distribution channels other than Normal Retail Sales, such as EP records, premium records, records sold on military bases, long play singles, budget records and affiliated record clubs, are set forth in paragraphs 3.05, 3.07 and 3.08. None of these provisions apply to the licensed digital exploitation of recordings derived from the Capricorn Master by unaffiliated third parties.

22. Paragraph 3.06 sets forth the royalty rate for instances where UMG is not itself (or through affiliates) duplicating and selling records, but instead, *inter alia*, is licensing the Capricorn Masters to unaffiliated third parties for the sale of records, licensing the Capricorn Masters on a flat-fee (as opposed to a percentage of revenue) basis, or is engaging in any other exploitation of the Capricorn Masters that is not specifically described in the Agreement. That paragraph states, in pertinent part:

> 3.06. (a) With respect to the following Records and/or to exploitation of the Master Recordings, the royalty to be accrued hereunder shall be a sum equal to fifty percent (50%) of PRI's net receipts with respect to such exploitation: (i) Records derived from Master Recordings hereunder sold through Non-Affiliated Third Party record clubs or similar sales plans operated by Non-Affiliated Third Parties, (ii) license of Master Recordings to Non-Affiliated Third Parties for sales of Records by such licenses through direct mail, mail order or in conjunction with TV advertising, including through methods of distribution such as "key outlet marketing" . . . or by any combination of the methods set forth above or other

   methods, (iii) licenses of Master Recordings on a flat-fee
basis and (iv) any other commercial usage not specifically
provided for herein.

23.  At the time the 1985 PRI Agreement was executed, the compact disc was still in its infancy as a music distribution format. In recognition of this, and in further recognition that other distribution formats would likely be developed during the applicable term of the Agreement, the parties included a provision for the treatment of compact discs and other new configurations. Paragraph 3.04 of the Agreement applies to all compact discs and other future new configurations through which recordings derived from the Capricorn Masters may be distributed to consumers. Each time UMG releases a new product derived from the Capricorn Masters on CD or other new configuration, UMG is granted three years to pay royalties for that specific product based upon the rate that would apply if the product were released on an existing configuration, such as a vinyl album or single.

24.  At the end of each such three-year period, however, paragraph 3.04 requires UMG to engage in good faith renegotiation of the royalty rates for the product released in a new configuration. During the time that the parties are negotiating in good faith, paragraph 3.04 provides that UMG shall continue to have the right to exploit the product. If no agreement is reached on a new royalty rate, however, UMG may no longer distribute or exploit the product in that new configuration.

## UMG's Breaches of the 1985 PRI Agreement

25.  Plaintiffs have performed their material obligations pursuant to the 1985 PRI Agreement.

26.     Over the past several years, new digital music distribution channels have been developed. These new channels allow consumers to receive digital recordings in various manners, including by download over the Internet to personal computers and cell phones. The market share for digital distribution is increasing every year, and comprises a significant portion of recordings artists' sales, especially for legendary groups like the Allman Brothers Band, which has many classic recordings in its catalogue.

27.     Unlike traditional record sales, where the record label manufactures, promotes and sells the physical copies that are distributed to consumers, in digital distribution channels UMG licenses a third party to reproduce and distribute digital copies of recordings derived from the Capricorn Masters. UMG licenses certain third parties, such as Apple, Buy.com, Zune, Rhapsody, Napster, Urge and others, to reproduce and distribute downloads, or digital phonorecord deliveries, of the recordings, by transmitting the digital copies to a consumer's home computer or cell phone. Certain of these services charge consumers a flat fee for each recording downloaded, while others charge a monthly subscription fee. UMG licenses other third parties, such as mobile phone companies, media companies and aggregators, to make and transmit digital copies to customers for use as mobile phone ringtones. UMG licenses other digital uses of recordings derived from the Capricorn Masters as well.

28.     When UMG licenses recordings to digital providers, it bears very little, if any, cost or risk typically associated with UMG's manufacture and sale of physical records. Instead, the cost and risk is borne by the digital provider. This is particularly true of the Capricorn Masters, which long ago recouped any initial recording or acquisition expense.

29. UMG's digital exploitation of the Capricorn Masters through its deals with digital providers does not constitute sales by UMG for distribution through normal retail channels and such exploitation is not subject to the royalty provisions of paragraphs 3.01 or 3.02. The definition of Normal Retail Channels expressly excludes the sale of new configurations such as digital downloads and ringtones. Nor is such exploitation subject to the royalty provisions of 3.03, 3.05, 3.07 or 3.08. Instead, UMG's digital exploitation is subject to the royalty provision of 3.06, which obligates UMG to pay the members of the Allman Brothers Band fifty percent of UMG's net receipts from such exploitation.

30. UMG has not, however, fulfilled its contractual obligation to pay royalties at the fifty percent rate. Instead, it has pretended that its licensing of third parties and other digital exploitation constitute sales by UMG for distribution through normal retail channels and has therefore accounted to Plaintiffs at a much lower rate than is required by the 1985 PRI Agreement.

31. Plaintiffs have repeatedly notified UMG of its breach, yet UMG continues to willfully breach the Agreement by paying royalties for digital exploitation at the wrong, and much lower, rate. Through these breaches, UMG has deprived Plaintiffs of royalties believed to be in excess of one million dollars ($1,000,000).

32. UMG has also breached the 1985 PRI Agreement by refusing to renegotiate rates for compact discs and other new configurations. In 1994, PRI and Plaintiffs renegotiated rates, pursuant to paragraph 3.04, for various compact discs that had been released up to that point (the "1994 PRI Supplemental Agreement"). Since that time, UMG has released various newly-configured compact discs, including new releases of all the Allman Brothers Band's classic albums covered by the 1985 PRI Agreement

with added material and/or under new catalogue numbers. Pursuant to paragraph 3.04, UMG was required to renegotiate rates three years after the release of each such newly-configured compact disc. Plaintiffs have repeatedly demanded that UMG renegotiate rates for such compact discs, but UMG has refused to negotiate, in breach of the 1985 PRI Agreement.

33. As noted above, UMG's digital exploitation of the Capricorn Masters is subject to the royalty provisions of paragraph 3.06 of the 1985 PRI Agreement. In the alternative, the distribution of digital copies in the form of downloads, ringtones, and otherwise, constitutes a new configuration and is subject to the renegotiation requirement of paragraph 3.04. Although UMG initially stated it would engage in such renegotiations, when Plaintiffs attempted to begin actual negotiations, UMG failed to participate, in breach of the 1985 PRI Agreement.

34. Plaintiffs have notified UMG of its breaches by failure to renegotiate. Notwithstanding such notifications, UMG has continued to exploit the post-1994 compact discs and new digital configurations. Paragraph 3.04 of the 1985 PRI Agreement, however, only permits UMG to exploit those products for three years after each product's initial release and during the required renegotiation. Because it refused to engage in the required renegotiations, such renegotiations are no longer pending and UMG's right to continue to exploit the post-1994 compact discs and new digital configurations was extinguished. UMG has further breached the 1985 PRI Agreement by continuing to exploit the post-1994 compact discs and new digital configurations after attempts at renegotiation failed. In doing so, UMG has been unjustly enriched in the

amount of its revenues from such unlawful exploitation, believed to be at least twelve million dollars.

## CLAIM I

### (Breach of Contract – Underpayment of Royalties for Digital Exploitation)

35. Plaintiffs hereby reallege and incorporate herein the allegations set forth in each and every preceding paragraph of this Complaint.

36. UMG's failure to correctly calculate Plaintiffs' royalties for UMG's licensing and other digital exploitation of the Capricorn Masters pursuant to paragraph 3.06 of the 1985 PRI Agreement constitutes a breach of that Agreement.

37. UMG's breach has at all times been willful and in bad faith.

38. Plaintiffs, through their representatives, have repeatedly and in writing notified UMG of its breach. Despite such notice, UMG has failed to cure its breach and continues to incorrectly calculate and pay Plaintiffs' royalties.

39. By reason of the foregoing, and other acts not presently known to Plaintiffs, UMG has knowingly and materially breached its contractual obligations under the 1985 PRI Agreement and has wantonly disregarded the rights of Plaintiffs. As a direct consequence, Plaintiffs have been damaged in an amount to be determined at trial, but believed to be in excess of one million dollars ($1,000,000).

## COUNT II

### (Breach of Contract – Failure to Renegotiate Compact Discs)

40. Plaintiffs hereby reallege and incorporate herein the allegations set forth in each and every preceding paragraph of this Complaint.

41. UMG's refusal to renegotiate royalty rates for compact disc configurations derived from the Capricorn Masters that were released after the date of the 1994 PRI Supplemental Agreement (including compact discs released after that date with added material and/or new catalogue numbers) constitutes a breach of the 1985 PRI Agreement.

42. After refusing to renegotiate, UMG's continued sale and distribution of the compact disc configurations released after the date of the 1994 PRI Supplemental Agreement constitutes a further breach of the 1985 PRI Agreement.

43. UMG's breaches have at all times been willful and in bad faith.

44. Plaintiffs, through their representatives, have repeatedly and in writing notified UMG of its breaches. Despite such notice, UMG has failed to cure its breaches and continues to unlawfully sell and distribute the compact disc configurations released after the date of the 1994 PRI Supplemental Agreement.

45. UMG's breaches are causing Plaintiffs irreparable harm, and cannot be fully remedied by readily ascertainable money damages. UMG therefore seeks a permanent injunction, preventing further breach of the 1985 PRI Agreement by UMG.

46. Due to the length and nature of the relationship between the Allman Brothers Band and UMG (including its predecessors PRI and Capricorn), UMG stands in a confidential and fiduciary relationship with Plaintiffs. Plaintiffs transferred their rights and otherwise entered into the 1985 PRI Agreement in reliance upon the promise in that Agreement to renegotiate and to cease exploitation of new configurations if no new agreement is reached. By continuing to exploit the compact disc configurations released after the date of the 1994 PRI Supplemental Agreement in violation of that promise,

UMG has been unjustly enriched. Any revenues received unjustly by UMG have been held in constructive trust for Plaintiffs. Plaintiffs therefore seek disgorgement of all such revenues, in an amount to be proven at trial but believed to be in excess of ten million dollars ($10,000,000).

## COUNT III

### (Breach of Contract – Failure to Renegotiate New Digital Configurations)

47.     Plaintiffs hereby reallege and incorporate herein the allegations set forth in each and every preceding paragraph of this Complaint.

48.     In the alternative to Count I, UMG's failure to renegotiate royalty rates for digital configurations derived from the Capricorn Masters constitutes a breach of the 1985 PRI Agreement.

49.     After refusing to renegotiate, UMG's continued exploitation of the digital configurations constitutes a further breach of the 1985 PRI Agreement.

50.     UMG's breaches have at all times been willful and in bad faith.

51.     Plaintiffs, through their representatives, have repeatedly and in writing notified UMG of its breaches. Despite such notice, UMG has failed to cure its breaches and continues to unlawfully exploit the digital configurations of recordings derived from the Capricorn Masters.

52.     UMG's breaches are causing Plaintiffs irreparable harm, and cannot be fully remedied by readily ascertainable money damages. UMG therefore seeks a permanent injunction, preventing further breach of the 1985 PRI Agreement by UMG.

53. Due to the length and nature of the relationship between the Allman Brothers Band and UMG (including its predecessors PRI and Capricorn), UMG stands in a confidential and fiduciary relationship with Plaintiffs. Plaintiffs transferred their rights and otherwise entered into the 1985 PRI Agreement in reliance upon the promise in that Agreement to cease exploitation of new configurations in the absence of a completed renegotiation. By continuing to exploit the digital configurations in violation of that promise, UMG has been unjustly enriched. Any revenues received unjustly by UMG have been held in constructive trust for Plaintiffs. Plaintiffs therefore seek disgorgement of all such revenues, in an amount to be proven at trial but believed to be in excess of two million dollars ($2,000,000).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Defendant UMG as follows:

1. As to Count I, that UMG pay to Plaintiffs an amount to be determined at trial, but believed to be in excess of one million dollars ($1,000,000).

2. As to Count II, that UMG, and each of its officers, directors, agents, servants, employees and representatives, and those persons in active concert or participation with them or any of them, be permanently enjoined and restrained from the sale, distribution or other exploitation of any compact discs derived from the Capricorn Masters that were released after June 20, 1994, including such compact discs re-released after that date with added material or under new catalogue numbers.

3. As to Count II, that a constructive trust be imposed and UMG ordered to disgorge all revenues from its sale, distribution or other exploitation of any compact discs

derived from the Capricorn Masters that were released after June 20, 1994, in an amount to be proven at trial, but believed to be in excess of ten million dollars ($10,000,000).

4. As to Count III, that UMG, and each of its officers, directors, agents, servants, employees and representatives, and those persons in active concert or participation with them or any of them, be permanently enjoined and restrained from the sale, distribution or other exploitation of any digital configurations of recordings derived from the Capricorn Masters.

5. As to Count III, that a constructive trust be imposed and UMG ordered to disgorge all revenues from its sale, distribution or other exploitation of any digital configurations of recordings derived from the Capricorn Masters, in an amount to be proven at trial, but believed to be in excess of two million dollars ($2,000,000).

6. That Plaintiffs be awarded pre-judgment interest, post-judgment interest, its costs, including reasonable attorneys' fees, and all further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demands trial by jury, pursuant to Fed. R. Civ. P. 38(b), for all issues so triable.

Dated: August 11, 2008
       New York, New York

                                    MOSES & SINGER LLP

By: _____
     Paul M. Fakler (PF-0249)
     Ross Charap (RC-2584)
     Julie Stark (JS-8925)
     Amanda J. Schaffer (AS-2004)
     405 Lexington Avenue
     New York, New York 10174-1299
     Tel.: 212-554-7800
     Fax: 212-554-7700
     pfakler@mosessinger.com

*Attorneys for Plaintiffs*